CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 28 2012

JULIA C. DUDLEY, CLERK
BY: /s/ _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| INTERNATIONAL FIDELITY INSURANCE COMPANY, | ) ) ) |
| Plaintiff | ) ) |
| v. | Civil Action No. 7:11-cv-00441 ) ) |
| WESTERN VIRGINIA WATER AUTHORITY, | ) ) |
| Defendant/Third-party Plaintiff | ) **MEMORANDUM OPINION** ) |
| v. | ) ) |
| FIRST STATE BANK | ) ) |
| and | ) By: Hon. Glen E. Conrad ) Chief United States District Judge |
| CARNELL CONSTRUCTION CORPORATION, | ) ) |
| Third-party Defendants. | ) |

This case concerns multiple contract disputes stemming from a construction project at the Falling Creek Dam in Bedford County. This is the second time the court has had reason to issue a decision in the case. This opinion concerns the original complaint filed by International Fidelity Insurance Company against Western Virginia Water Authority. The parties filed cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, and the court heard argument on the matters addressed in the parties' briefs. For the reasons that follow, the court will grant in part and deny in part the plaintiff's motion for summary judgment, and grant in part and deny in part the defendant's motion for summary judgment.

I. **Factual and Procedural Background**

On September 14, 2011, International Fidelity Insurance Company ("IFIC"), the plaintiff in this action, filed a complaint against Western Virginia Water Authority ("Authority"), the defendant and third-party plaintiff. The complaint seeks monetary and declaratory relief, and alleges claims of breach of contract, equitable subrogation, and unjust enrichment. (Docket No. 1 at 1.)

According to the complaint, the Authority entered into a contract ("Contract") with Carnell Construction Company ("Carnell") on May 4, 2009, for construction and grading work on the Falling Creek Dam Renovation ("Project"). (Id. at 2.) The total price for Carnell's work on the project was $1,827,123.00, and the Contract provided for monthly payments to Carnell in a total amount equaling ninety-five percent of the contract price with five percent of the monthly payments to be retained in an escrow account. The Contract obligated the Authority to pay Carnell any remaining contract balance upon completion of the Project. On April 6, 2009, IFIC, as surety, issued a labor and material payment bond ("Bond") on behalf of Carnell to satisfy any unpaid subcontractors working on the Project. (Docket No. 1-3.) Prior to issuing the Bond, IFIC required Carnell to execute an Agreement of Indemnity ("Indemnity Agreement"). (Docket No. 1-4.) The Indemnity Agreement established the rights of IFIC in the event IFIC was forced to make a payment under the Bond. The Indemnity Agreement also contained a clause assigning all of Carnell's rights, including any unpaid contract balance and retainage amounts, to IFIC in the event IFIC incurred a loss on the Bond.

The Authority, Carnell, and First State Bank ("First State") also entered into an escrow agreement ("Escrow Agreement") with respect to the Contract. (Docket No. 4-1, Ex. B.) IFIC signed the Escrow Agreement as surety for Carnell. (Id.) The Escrow Agreement provided that the Authority would pay into the escrow account the five percent retainage, and that First State,

2

as the escrow agent, would pay to the Authority or Carnell any amounts as instructed by the Authority. (Id.; Docket No. 4-1, Ex. B.) The Authority alleges that it paid a five percent retainage amount in the escrow account each time Carnell submitted a payment request, resulting in a total balance in the escrow account of $85,823.33. However, the checks First State received did not clearly indicate they were being paid to First State as escrow agent. As a result, when First State received these checks from the Authority, First State deposited them into the separate business savings account of Carnell, which had been a long-time banking customer of First State. (Docket No. 25-1 at 3.)

On June 14, 2011, Carnell completed the Project. (Docket No. 1 at 3.) According to the complaint, IFIC—in its role as surety for Carnell—received and paid a payment bond claim from one of Carnell's subcontractors, Ferguson Enterprises ("Ferguson"), in the amount of $286,571.44. (Id.). Based on this involuntary assignment, IFIC argues in its complaint that it is the proper party to receive the outstanding balance of $85,823.33 under the Contract. (Docket No. 1.) Accordingly, IFIC contacted the Authority to request that it pay the remaining contract balance due on the Project directly to IFIC. (Docket No. 1 at 4.) In a June 14, 2011 letter, the Authority advised Carnell that, as a result of IFIC's subrogation claim, it intended to pay the remaining contract balance to IFIC (including the $85,823.33 supposedly being held in escrow). (Id.) Carnell indicated its agreement with this proposal by signing and returning to the Authority a copy of the June 14 letter. (Id.)

The Authority then directed First State to release to IFIC the funds it believed were being held in the escrow account. (Docket No. 21 at 4; Docket No. 4-1, Ex. C.) However, First State could not comply with this direction, having deposited all of the checks directly into Carnell's separate account. (Docket No. 21 at 4.) The Authority issued a check to IFIC in the amount of

3

$33,865.98, leaving the remaining balance due on the Project at $85,823.33, the amount that it had attempted to pay into the escrow account. (Id.)

IFIC filed its complaint on September 14, 2011, seeking to recover from the Authority the $85,823.33 balance on the Project. (Docket No. 1.) On October 26, 2011, the Authority filed a third-party complaint attempting to hold both First State and Carnell liable as third-party defendants for the unpaid balance on the Project. (Docket Nos. 6 and 21.) The court heard argument on the Authority's third-party complaint and issued an opinion denying in part and granting in part First State's motion to dismiss and motion for summary judgment, and ultimately granting additional discovery into the issue of whether First State had actual knowledge that the checks it received from the Authority should have been placed in the escrow account. See Int'l Fid. Ins. Co. v. W. Virginia Water Auth., No. 7:11-cv-00441, 2012 WL 2357368, at *8 (W.D. Va. June 20, 2012).

IFIC and the Authority then filed cross motions for summary judgment, and the court heard oral argument on September 20, 2012. In its motion for summary judgment, IFIC seeks two awards of monetary relief: first, it claims damages in the amount of $85,823.33 that should have been retained under the Escrow Agreement ("Contract Retainage"); and second, it seeks reimbursement of the $286,571.44 it paid to Ferguson on behalf of the Bond Agreement ("Payment Bond Claim").

## II. Discussion

### A. Legal Standard

In considering a motion for summary judgment under Federal Rule of Civil Procedure 56, "the court is required to view the facts and draw reasonable inferences in a light most favorable to the nonmoving party." Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). Viewing the facts

4

in this light, summary judgment is proper only if there is no genuine issue of material fact and judgment is appropriate as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322–24 (1986); Hoyle v. Freightliner, LLC, 650 F.3d 321, 331 (4th Cir. 2011). A genuine issue of material fact exists when the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### B. Analysis

#### i. Contract Retainage

Taking the Contract Retainage claim first, IFIC argues that because it is undisputed that IFIC was entitled to the unpaid balance of the contract in the event of a default by Carnell, it should receive the portion of the contract that was to be retained under the Escrow Agreement. IFIC points out that the Authority initially agreed to pay IFIC the Contract Retainage. (Docket 4-1, Ex. A) ("Of the amount remaining to be paid under the Contract, $85,823.33 is being held under an Escrow Agreement . . . under which the Water Authority has the power to direct the funds. The Water Authority proposes to pay this amount to your bonding company."). Only after the Authority was made aware that the funds had never been placed in an escrow account did it dispute its obligation to pay IFIC the total remaining balance on the Contract. IFIC argues that the language of the Indemnity Agreement entitles it to a full assignment of Carnell's rights to the Contract Retainage as a matter of law, or by virtue of the doctrine of equitable subrogation.

Under Virginia law, "[w]hen a principal defaults on a contract guaranteed by a performance or payment bond and the surety performs on the bond, principles of surety law and the doctrine of equitable subrogation impose certain rights and duties running between the surety, principal, and obligor, and allow the surety to enforce such rights and duties." XL

5

Specialty Ins. Co. v. Commonwealth, 269 Va. 362, 369 (2005) (citing Dickenson v. Charles, 173 Va. 393, 400 (1939)). In other words, the doctrine of equitable subrogation allows for a surety to essentially "step into the shoes of" a principal and enforce its rights. Id. However, a surety does more than merely "step into the shoes of" the principal, as "a performing surety may recover retainage held by the owner even though the contractor could not recover such retainage." Id. (citing International Fidelity Ins. Co. v. Ashland Lumber Co. 250 Va. 507, 511 (1995)). When a surety performs on a payment bond, the surety has "an equitable right" to indemnification out of a retained fund that the contractor no longer possesses. See Pearlman v. Reliance Insurance Co., 371 U.S. 132, 137 (1962). This is because such funds are often established as much for the benefit of the surety as that of the owner, and serve as collateral that incentivizes the contractor to finish its work on time and fulfill its obligations to subcontractors. Id. In American Surety Co. v. Plank & Whitsett, the Supreme Court of Virginia made this clear:

> The fund created by this retained percentage was required not only as a protection to the owners, to be used in the event that the contractor defaulted in any of his obligations, but as a fund out of which the surety might be paid, in the event that it elected to complete the building after the default of the contractor, and out of which they had a right to be reimbursed for the payments they might be compelled to make laborers and materialmen.

159 Va. 1, 13 (1932).

Importantly, the surety's right to the unpaid contract balance relates back to the date the surety issued the bonds on the underlying contract. See In re Jones Construction & Renovation, Inc. 337 B.R. 579, 583 (Bankr. E.D. Va. 2006) ("[T]his right [to retained funds] relates back to the date of the surety's issuance of bonds for the contract.") (quoting Pearlman, 371 U.S. at 137) (citations omitted). In Jones, the bankruptcy court held that the surety had superior rights over the bankruptcy estate to retained funds because the surety's interests related back to the date it issued the bond. Id.; see also Western Casualty and Surety Co. v. Brooks, 362 F.2d 486, 489-90

(4th Cir. 1966) ("[S]ince this 'equitable right' of the surety to the fund relates back to the date of the surety bond, it entitles the surety to priority in payment over all subsequent lienholders and general creditors.").

The Authority does not dispute that IFIC was entitled to the $33,865.98 remaining on the Contract at the time of the Project's completion. In fact, the Authority did not even originally dispute IFIC's right to the $85,823.33, provided it had been properly retained in an escrow account. (Docket No. 4-1, Ex. A.) The Authority argues, however, that because Carnell is no longer legally entitled to any of the retained funds, IFIC cannot make a claim for the money either. The Authority writes in its brief that "[a]t the time IFIC paid Ferguson's claim, Carnell only had a right to the $35,865.98 unpaid balance on the contract. The Authority provided this unpaid balance to IFIC on August 4, 2011." (Docket No. 53 at 8.) Thus, the Authority avers, it fulfilled its obligation to Carnell, and IFIC, in Carnell's stead, cannot make a claim that Carnell could not. However, this assertion overlooks the statement by the Supreme Court of Virginia in XL Specialty that a surety does more than merely step into the shoes of the principal. XL Specialty, 269 Va. at 369 ("[I]f a contractor defaults on a bonded construction contract, a performing surety may recover retainage held by the owner even though the contractor could not recover such retainage."). A surety has rights to the retained funds that are distinct from, and greater than, those of the contractor. Id.; see also Fidelity & Cas. Co. v. Copenhaver Contracting Co., 159 Va. 126, 139-40 (1932) ("[T]he surety is entitled to be subrogated to the rights which the obligee had to, or could assert against, such funds upon the principal contractor's default to the extent necessary to reimburse itself for the outlay made to complete the contract.").

Moreover, IFIC's rights to the entire balance of the contract were established on the date it issued the bond. See Western Casualty & Surety, 362 F.2d at 489-90. The fact that Carnell

7

improperly received the Contract Retainage amount after the Bond was issued does not diminish IFIC's pre-existing rights to those funds.

Such a result is supported by the policy reasons underlying the principle of equitable subrogation as well. Sureties, like bond obligees, require portions of contractual payments to be retained in order to incentivize a contractor to finish work on a project. Here, IFIC was a signatory to the Escrow Agreement requiring that five percent of the contract price be retained in a separate account until after the Project's completion. The Indemnity Agreement specifically mentioned that IFIC would have rights to the retained funds in exchange for its agreement to bond Carnell. Sureties like IFIC rely on the collateral they obtain from escrow agreements in deciding whether to bond contractors, and they are entitled to the retained funds if the principal defaults.

The Authority argues that IFIC has no claim to the Contract Retainage unless it can show that the Authority "materially altered" IFIC's contract with Carnell to such an extent that IFIC was discharged from its obligations under the Bond. IFIC defends this claim by arguing that the Authority's failure to establish the escrow account amounted to a material alteration of the contract.[1] However, this issue more properly belongs in the analysis of IFIC's demand for the

---

[1] In support of this argument, IFIC paraphrases the Restatement (Third) of Suretyship and Guaranty §37:
    (1) If the obligee [here, WVWA] acts to increase the secondary obligor's [here, IFIC] risk of loss by . . . decreasing its potential ability to cause the principal obligor [here, Carnell] to bear the costs of performance, the secondary obligor [IFIC] is discharged . . . and the secondary obligor [IFIC] has a claim against the obligee [WVWA] . . .

    (4) If the obligee [WVWA] impairs the secondary obligor's [IFIC's] surety status [in this case through premature payment of the retainage that dissipated IFIC's collateral] . . . (b) before the secondary obligor [IFIC] performs a portion of the secondary obligation [in this case payment to Ferguson], if the secondary obligor [IFIC] then performs: . . .

    (ii) for the benefit of an intended beneficiary [here, Ferguson] who can enforce the secondary obligation notwithstanding such impairment: . . . the secondary obligor [IFIC] has a claim against the obligee [WVWA] with respect to such performance to the extent that such impairment would have discharged the secondary obligor [IFIC] with respect to that performance.
(Docket No. 51 at 12.)

8

$286,571.44 under the Payment Bond Claim. Determining whether the Authority materially altered the contract[2] is unnecessary in establishing IFIC's rights in the Contract Retainage, which are separate from its contractual rights and which vested the date it issued the Bond to Carnell. See XL Specialty, 269 Va. at 369 ("Equitable Subrogation is subrogation that arises by operation of law. It is not based on contract or privity of parties, but is purely equitable in nature, dependent on the facts and circumstances of each particular case.") (quotation marks and citations omitted); see also Memphis & L.R.R. v. Dow, 120 U.S. 287, 301-02 (1887) ("The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties."). The court concludes that IFIC was entitled to the $85,823.33 Contract Retainage as soon as Carnell defaulted, and thus will grant IFIC's motion for summary judgment on that claim.

### ii.     Payment Bond Claim

Turning now to the issue of material alteration, IFIC also seeks reimbursement for the $286,571.44 payment it made to Ferguson, arguing that the Authority's failure to properly retain contract payments discharged IFIC's obligations as a surety. IFIC asserts that it is entitled to reimbursement because, had it known that the contract retainage was not being withheld by the Authority, IFIC would have refused to pay Ferguson's bond claim.

There is precedent under Virginia law and elsewhere for the proposition that an obligee's actions in violation of a contract between an owner and a contractor will, in certain circumstances, discharge a surety from its obligations to pay the contractor's debt. "[I]f the owner and contractor engage in practices that constitute a material change in the construction contract provisions, and the contractor subsequently defaults on the contract, the surety is

---

[2] This issue is discussed infra, at II.B.ii.

9

entitled to a discharge of its obligations to pay the contractor's debt." XL Specialty, 269 Va. at 370 (citing Southwood Builders, Inc. v. Peerless Ins. Co., 235 Va. 164, 168-71 (1988)); see also Lumbermens Mutual Casualty Co. v. U.S., 654 F. 3d 1305, 1314 (Fed. Cir. 2011) ("[One] ground for discharge . . . is that the obligee has prejudiced the surety by improperly making early contract payments or overpayments to the principal obligor in a manner inconsistent with specific payment schedules, conditions, or retainage provisions in the bonded contract."). Whether the obligee's actions constitute a material alteration is based at least in part on the good faith of the party. See Plank & Whitsett, Inc., 159 Va. at 17 ("[W]hen the surety is required to make reimbursements for a loss occasioned by the default of the principal, it has a right to require the owners to show how and in what manner they have performed their part of the contract . . . . The obligee in the bond is not only required to exercise good faith with the surety at the time the obligations are assumed, but this good faith must be kept inviolate in all subsequent transactions affecting their rights and obligations created by the contract and the bond.").

Cases in which a surety's obligations have been discharged generally involve a project owner prepaying or overpaying on a contract to such an extent that it materially altered the surety's rights and expectations by reducing the contractor's incentive to complete its project in a timely and satisfactory manner. See Continental Ins. Co. v. City of Va. Beach, 908 F. Supp. 341 (E.D. Va. 1995) (finding that prepayment of over half the original contract amount constituted a "material variation" of the contract that discharged the surety from its obligations); Southwood Builders, 235 Va. at 170-71 (finding that overpayment of $31,000 on an original contract of $79,500 amounted to a material alteration that discharged the surety's obligations). Substantial prepayment diminishes a key piece of the collateral a surety considers when it decides to enter

10

into a bond agreement with a contractor. Many payment bonds, including the one at issue in this case, incorporate the underlying construction contract into the bond agreement, thereby offering security to the surety that the contractor will not default on its obligations to subcontractors. (Docket No. 1-3 at 1.)

In this case, the material alteration alleged is the "prepayment" of the portion of the contract that should have been retained in escrow. On a total contract price of over $1.8 million, $85,823.33—roughly five percent—was prematurely disbursed to Carnell. The court finds this smaller sum is substantially disproportionate to the much larger amounts involved in those cases in which the surety's obligations were deemed to have been discharged. In both Southwood and Continental, the court noted the significant size of the payments in relation to the original contract in determining that the contracts had been materially altered by prepayment. The relative insignificance of the $85,823.33 in comparison to the total contract price in this case militates against finding a material alteration.

Additionally, there is no showing of bad faith on behalf of the Authority in failing to retain the sums. The Supreme Court of Virginia has implied that bad faith directed at the surety is not necessary to a showing of material alteration. See Southwood Builders, 235 Va. at 170 ("A separate showing of prejudice to the surety is unnecessary because a material deviation, in itself, establishes sufficient prejudice."). However, in evaluating material alteration claims, it is clear that some courts have considered whether the obligee actually took into account what effect prepayment would have on the rights of the surety. In Continental, the Court noted that the obligee was unconcerned about paying the contractor early or for defective work because "the surety would always be available to complete the job and/or pay for the repairs." 908 F. Supp. at 348. The Court found the obligee's complete lack of concern for whether prepayment to the

11

contractor would discourage it from completing the job a sound basis for discharging the surety's obligations. Id.; see also Plank & Whitsett, 159 Va. at 17 (requiring obligees to exercise "good faith" with respect to the surety's rights throughout the period covered by the bond).

IFIC makes no allegation here, nor does it appear from the facts that it could, that the Authority acted in bad faith in failing to ensure that the escrow account had been established. Which party is ultimately to blame for that mistake is the issue of the third-party complaint, but it appears that under no circumstances was the Authority anything more than negligent in its actions concerning the escrow account. Thus, the question of the Authority's good faith in handling the underlying contract also weighs against finding a material alteration.

Lastly, IFIC is a compensated surety, and should be expected to suffer some risks when it agrees to a payment bond contract. See C.S. Luck & Sons v. Boatwright, 157 Va. 490, 494-95 (1932) ("Sureties for hire are not wards of the court to be shielded from heedlessness or folly. They must abide by their contracts and pay everything which by fair intendment can be charged against them."). IFIC contacted the Authority before making its payment to Ferguson and discovered that the remaining balance on the contract totaled $119,689.31 (the $85,823.33 that should have been retained plus the $33,865.98 that was eventually paid to IFIC). Thus, at the time it paid Ferguson, IFIC could not have expected that anything more than this amount would be available should it later seek to cover its losses on the payment bond. The award of the $85,823.33 on the Contract Retainage claim places IFIC in exactly the position it expected to be in before making the payment to Ferguson.

After considering the small size of the prepayment amount, as well as the intentions and expectations of the parties throughout the dispute, the court finds that the Authority's failure to

12

retain a portion of the Contract price did not amount to a material alteration of IFIC's contract with Carnell. Thus, IFIC's claim for the $286,571.44 will be denied.

### iii. Prejudgment Interest

IFIC also seeks prejudgment interest under VA. CODE ANN. § 8.01-382 on any claim for which it is successful. Under Virginia law, a decision to award prejudgment interest is within the sound discretion of the court. Hannon Armstrong & Co. v. Sumitomo Trust & Banking Co., 973 F.2d 359, 369 (4th Cir. 1992) (citing Marks v. Sanzo, 231 Va. 350 (1986)). District courts should "weigh the equities in a particular case to determine whether an award of prejudgment interest is appropriate." Moore Bros. Co. v. Brown & Root, Inc., 207 F.3d 717, 727 (4th Cir. 2000). The court finds in this case that an award of prejudgment interest is not warranted. The basis for the court's decision is that the dispute between the parties involved a genuine legal question that the parties were entitled to litigate, and that neither party appears to have acted in bad faith. See Hewitt v. Hutter, 432 F. Supp. 795 800 (W.D. Va. 1977); Continental Ins. Co., 908 F. Supp. at 349. The court, therefore, will deny IFIC's request for an award of prejudgment interest.

## III. Conclusion

For the foregoing reasons, the court will grant in part and deny in part IFIC's motion for summary judgment, as well as grant in part and deny in part the Authority's motion for summary judgment. The court also denies IFIC's request for prejudgment interest.

The Clerk is directed to send certified copies of this order to all counsel of record.

ENTER: This 28th day of September, 2012.

/s/ Glen Conrad
_____
Chief United States District Judge